## Court of Appeals.

*March*, 1887.

## PEOPLE v. FITZGERALD.

BODY STEALING.

The statute against body-stealing (Pen. Code § 311) does not apply to exhumations made by legally constituted authorities for the purpose of ascertaining whether a crime has been committed in causing the death of the person whose body is exhumed.

When the exhumation is made openly on public application to the office of justice charged with the duty of inquiring into the cause of death of any person whose body is brought within his jurisdiction, all persons concerned in the exhumation cannot be punished for body-stealing in case any proceedings of the officer making the exhumation should be irregular.

It is debatable whether a *post mortem* should take place before the coroner has impaneled a jury.

But the *post mortem* should not be in the presence of the jury, and they are to be instructed by the testimony of the physicians who are designated by the coroner to make it.

Where the defendant has presented affidavits to a coroner which lead to the conclusion that a murder has been committed, and requests him to do his duty and make an examination of the body which is within his jurisdiction for the purpose of ascertaining whether such crime has been committed, such defendant, whatever may be his motives in requesting the coroner to act, is not guilty of body-stealing.

APPEAL by the defendant Eucebia Fitzgerald from a judgment of the General Term of the Supreme Court in the Fourth Department, of 11 January, 1887, affirming a judgment of the Court of Oyer and Terminer of Chemung county of 3d December, 1885, convicting her of body stealing.

The indictment in this case was as follows:

" The Grand Jury of the county of Chemung, by this indictment, accuse Eucebia Fitzgerald, Edmund A. Reilly and J. Thomas Nealson of the crime of body stealing, committed as follows:

The said Eucebia Fitzgerald, Edmund A. Riley and J. Thomas Nealson on the 9th day of April, 1835, at the city of

Elmira, in the county of Chemung, with force and arms un-
lawfully and feloniously did remove the dead body of a hu-
man being, to wit: that of William Irvine, from a grave or
place where the same had been buried, without authority of
law, for the purpose of dissection, for procuring the reward
for the return of the same; and for motives of malice and
wantonness, against the form of the statute in such case made
and provided.".

At the General Term the conviction was affirmed, the pre-
vailing opinion being written by Judge Boardman and Judge
Follett concurred.

Judge Hardin wrote a dissenting opinion which was ap-
proved by the Court of Appeals which reversed the judgment
of the General Term, both as a correct exposition of the
facts of the case and of the law applicable thereto.

This opinion of Judge Hardin was as follows:

HARDIN, P. J., (dissenting.)—General Irvine died in the
city of San Francisco on the Night of November 12, 1882,
suddenly, having during the day been out gunning, return-
ing to his home in the evening, after partaking of a light re-
past, consisting of tea, eggs, cold meat and bread and butter,
prepared by his wife Phœbe, who with their daughter, Mrs.
Merkle, were occupying apartments together.  Soon after
partaking of the refreshments he became distressed and made
complaints of internal pains.  The daughter left for a physi-
cian and upon returning they found that death had taken
place.  The remains were taken that night to the rooms of
an undertaker, and they were subsequently embalmed, and
on the 4th of December were conveyed by the widow and
daughter to the City of Elmira, where they were interred in
Woodlawn Cemetery.

About a year after the death inquiry was instituted as to
the cause thereof, and the defendant employed a detective
named Nealson, who visited the city of Elmira and returned
to San Francisco and made a report to the defendant, who
then applied to the undertaker who embalmed the body, and

to Dr. Wooster, the deceased's intimate friend and physician, who had viewed the body, and they gave affidavits of certain facts within their knowledge.

In the affidavit of Dr. Wooster, subscribed March 11, 1885, in connection with the statement of facts he adds, " In my opinion he was first poisoned in his food or drink and then when in agony from the effects of the dose he was struck on the head to stop his contortions and groans.

Porter, the undertaker, stated in the affidavit subscribed by him the condition of the remains when he received them, and that sundry persons viewed the remains, " among others Dr. Wooster, who remarked that to him it looked as having been poisoned."

With these papers in her possession the defendant visited the city of Elmira, where she met the detective Nealson. She sought legal counsel as to the method to be pursued in order to investigate whether General Irvine died a natural or unnatural death. She consulted an attorney, who advised her that the Coroner of the county of Chemung had jurisdiction to hold an inquest over the remains, and that the " papers upon their face authorized him (the coroner) or were sufficient, upon which he might exercise his discretion in the matter."

The defendant and Nealson visited the office of Dr. Reilly, the Coroner of the county of Chemung, and held a conversation in regard to the circumstances attending the death of the deceased. The affidavits of Porter and Dr. Wooster were presented to the coroner and the defendant asked Dr. Reilly " to do his duty as a coroner; to examine and see if the proofs were sufficient to authorize him in proceeding," and " that she wished the body to be taken up and the stomach or some part of it to be analyzed to see if there was any trace of poison there. She made the request that the evidence should be produced if it was there."

After that interview Coroner Reilly determined to proceed in the premises. He visited Nathan Baker, Superintendent of Woodlawn Cemetery, at his house, and said to him, viz:

" That he had evidence to satisfy him that a wrong had been perpetrated, or sufficient to warrant him in making an examination of the body of General Irvine, * * * that he had sufficient grounds of acting, and he asked Baker, the Superintendent, to " act," showing him one of the affidavits, and stating that he had others. Thereupon the Superintendent determined to act in the premises and facilitate the proceedings in behalf of the coroner. Thereupon directions were given Abbott, the sexton, to open the grave and remove the remains to the vault in the cemetery for the purpose of an examination.

Reilly, the coroner, also applied to Dr. Wey to become one of two physicians to make the examination, and on the evening of the 8th of April, Reilly visited the office of Wey with Nealson, avowing that he had full authority in the premises " to conduct an examination, and have an examination made by the physicians." The hour was fixed for an examination at ten the next morning, and Reilly informed Wey that he would " notify Dr. Squires * * and we might expect to meet at the receiving vault in Woodlawn Cemetery " at ten the next morning. Accordingly they met the next morning at the receiving vault in Woodlawn Cemetery, where the physicians found Coroner Reilly and Nealson and Baker and Abbott. The body was found lying in a coffin or casket on the floor of the receiving vault. The coroner made a minute of the nature of the covering of the coffin and its handles and the plate and the descriptions of every other matter connected therewith. Drs. Wey and Squires raised the head and shoulders of the body, and after carefully scrutinizing the face and the coroner making a minute thereof, a careful examination was made of the head, and the stomach and duodenum and certain other parts of the body were removed and delivered to Dr. Reilly, who placed them in a vessel he had prepared for that purpose.

After the examination the coroner went over to the house of Abbott, the sexton, in the cemetery grounds, where Baker suggested the propriety of having a coroner's jury, and Wey replied, " it is too late for such a proceeding."

Baker testified that he was present at the request of the coroner to identify the remains and that he did so identify them and that he was sworn upon that point by the coroner; that while at the vault he had a conversation with Dr. Reilly, the coroner, and he adds, viz.: " Dr. Reilly and myself conversed for a few minutes about having a jury, and I said to Dr. Reilly there was enough within the bounds of the cemetery to make up a jury, and he asked if I would have them all come to the house, and I so ordered and they came. I think there were five men that came off the cemetery. I think there were nine men there then. When I had sent for the men I went back to the house and did not go in the vault again. About that time Dr. Wey came over to the house."

He also testifies that he held a conversation with Dr. Wey and stated as follows, viz.: " Dr. Reilly has seemed to think it advisable to have a jury. There are men enough here to have a jury without delaying and there are men enough, they are already here; and Dr. Wey said it was of no use : that if there was anything found to show that this man died from any causes other than natural causes the whole procedure would have to go to California and this jury would never be heard of again. I stepped out of doors and Reilly was coming over from the vault and he had not yet come in the house and I said Dr. Wey thinks it is entirely useless to have a jury and I don't wish to urge this matter one way or the other, doctor, and Dr. Wey came out and he repeated to Dr. Reilly what he had said to me in the house, that it was no use to have a jury and he gave his reasons as I have stated."

No jury was, in fact, sworn to hold an inquest. The remains were recoffined and returned to the grave, except the parts removed therefrom as already stated.

Powers and duties of a coroner are conferred by statute. Section 773 of the Code of Criminal Procedure provides, viz.: " When a coroner is informed that a person has been killed or dangerously wounded by another, or has suddenly died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by the act of an-

other by criminal means, or has committed suicide, he must go to the place where the person is and forthwith summon not less than nine or more than fifteen persons, qualified by law to serve as jurors, to appear before him forthwith at as pecified place to inquire into the cause of the death or wounding.

Section 774 provides that " When six or more of the jurors appear they must be sworn by the coroner to inquire who the person was and when, where and by what means he came to his death or was wounded, as the case may be, and into the circumstances attending the death or wounding, and to render a true verdict thereon according to the evidence offered to them or arising from the inspection of the body."

Section 775 authorizes a coroner to issue subpœnas for witnesses, returnable, forthwith, or at such time and place as he may appoint. He must summon and examine as witnesses every person who, in his opinion, or that of the jury, has any knowledge of the facts. It also prescribes " he must summon as a witness a surgeon or physician who must in the presence of the jury inspect the body and give a professional opinion as to the cause of the death or wounding."

These sections of the law are substantially re-enactment of the provisions of the Revised Statutes in respect to coroners' inquests. 2 R. S., 743.

We are of the opinion that the affidavits and information lodged with the coroner were sufficient to justify his exercise of his discretion to proceed in the premises.

The expression in Section 773 of the Code of Criminal Precedure, to wit, " When a coroner is informed that a person has been killed or dangerously wounded," etc., seems to warrant the conclusion that affidavits, or information even not sworn to, may be acted upon by a coroner in determining whether it is his duty to proceed in a given case. When such information produces in the mind of the coroner " a reasonable ground to suspect that a death has been occasioned by the act of another by criminal means," he must go to the place where the person is.

We find no exception or exclusive words in the Statute

which restrict or limit the duty of a coroner in case such information shall be given to him so as to exclude the examination of the body found within his jurisdiction, although the death may have been occasioned or produced in another jur' isdiction.

The coroner is "a very ancient office at the common law.'- 1 Blackstone Comm. 347.

The Lord Chief Justice of the King's Bench is the principal coroner in the kingdom and may, if he please, exercise the jurisdiction of a coroner in any part of the realm. The office is of equal antiquity with the sheriff. There the coroner was chosen for life and his office and power were like those of the sheriff, either judicial or ministerial. 1 Blackstone, 348.

The coroner's court was one of record. 4 Blackstone, 247. His proceedings being in a court of record might be reviewed by certiorari. While certain of the powers and duties which devolve upon a coroner and his court in England have been devolved upon a coroner by statute in this country, it has uniformly been held that a coroner does not hold a court of record, and that he has only such powers as are conferred upon him by statute. *People* v. *Budge,* 4 Park. 521; Crocker on Sheriffs, 907.

In England the finding of a coroner's jury is equivalent to a bill of indictment. Not so in this country. *People* v. *Budge, supra.* In *Reg.* v. *Ellis,* 2 C. & K., 470, it was held that in a case of manslaughter, where the cause of the death and the death occurred in a county, and the body after death was removed to a city, and the coroner of the city held the inquest and he was tried for the manslaughter on the inquisition that the inquest was properly held, under 6 & 7 Victoria, Ch. 12.

We think it was properly held at the trial that the coroner of Chemung had jurisdiction to proceed under the statute to inquire into the cause of the death. For that purpose he was authorized to employ a surgeon or physician to make a post-mortem examination. Section 775, Code Crim. Proc.

Necessarily in the discharge of the duties of a coroner he must exercise some discretion as to the order of events. In the case in hand, before a surgeon or physician could examine the body it was necessary that it should be removed from the grave, and proper that it should be placed, as it was, in the vault, a suitable place for making the examination by the surgeons or physicians, and, also, for the purpose of being viewed by a jury.

It seems that in England, where the duty of the coroner is judicial, he can only take an inquest *super visum corporis*, and that an inquest not thus taken is void. *Rex* v. *Ferrand*, 3 Barn. and Ald., 261.

In the case last cited it was said, "If a body be interred before he come he must dig it up." "This he may do lawfully within any convenient time, as within fourteen days." If the coroner had summoned a jury and had them sworn in the presence of the body in the vault, undoubtedly his inquest would have been valid. In the ordinary discharge of his duty such jury should have been sworn, viewed the remains and certified to their inquest.

Though it be conceded that no valid inquest was held we are to inquire whether the acts of the coroner and those inducing him to act and aiding him in the performance of his duty are criminal, because, forsooth, the coroner improperly omitted to complete a valid inquest.

It must be assumed that the coroner had jurisdiction, and was therefore warranted in causing the body to be removed from the grave for the purpose of enabling him to hold an inquest thereon, and that he had authority to employ a physician to aid in a post-mortem examination of the remains.

Section 308 of the Penal Code provides, viz: "The right to dissect the dead body of a human being exists in the following cases: First, in cases prescribed by special statutes. Second, whenever a coroner is authorized by law to hold an inquest upon the body so far as such coroner authorizes dis section for the purposes of the inquest and no further."

It must be assumed that there was no unlawful dissection

authorized or carried forward by the coroner. *Rhodes* v. *Brandt*, 21 Hun, 1, and that the coroner had a discretion "to determine whether any persons and what persons may be present besides the surgeons." *Crisfield* v. *Perine*, 15 Hun, 202, affirmed, 81 N. Y., 622. In that case it was said, "Not even the jurors have a right to witness the examination. They are to be informed of what it discloses by the testimony of the surgeons."

We do not understand that the trial judge indicated that there had been any unlawful dissection of the body of the deceased. Assuming, pursuant to Section 29 of the Penal Code, that the defendant was a principal, or, as the law stood before the adoption of that section, an accessory before the fact, it is claimed that she was guilty of the crime of body stealing in that she induced or procured the coroner to commit that crime.

Section 311 of the Penal Code provides who shall be liable for that crime in the following language, viz: "A person who removes the dead body of a human being or any part thereof from a grave, vault or other place where the same has been buried, or from a place where the same has been deposited while awaiting. burial *without authority of law* with intent to steal the same or for the purpose of dissection, or for the purpose of procuring a reward for the return of the same, or from malice or wantonness, is punishable by imprisonment for not more than five years or by a fine not exceeding one thousand dollars or both."

In order to constitute the crime under this statute there must be a removal of "the dead body of a human being from a grave, vault or other place where the same has been buried * * * without authority of law." If such removal is made with the authority of law no crime can be predicated of the act, and where the removal takes place without any warrant of law it must also be found as a fact that it was made with intent to sell the body or for the purpose of dissection or for the purpose of procuring a reward for the return of the same, or from malice or wantonness.

It is not claimed upon the evidence before us that the body was removed with any intent to sell the same, nor was it held at the trial, nor do we think upon the evidence given at the trial it could justly have been held that it was removed for the purpose of dissection. Nor do we think upon the evidence given upon the trial that a finding that the removal from the grave was for the purpose of procuring a reward for the return of the body was authorized.

But it is claimed that the removal was made from malice or wantonness. The physical, actual removal was made by Abbott, the sexton. Surely the evidence does not warrant a finding that he was actuated by malice or wantonness, nor does the evidence indicate or warrant the conclusion that Baker, the superintendent of the cemetery, in giving directions to open the grave and make a transfer of the remains to the vault preparatory to an examination by a physician and an inspection by a jury, was actuated by malice or wantonness. Apparently he believed it was his duty to yield to the requests made by Reilly, the coroner, in that regard. Nor is there any evidence which satisfies the judgment that Reilly, the coroner, entered upon the discharge of his duty in the premises, collusively, maliciously or wantonly. On the contrary the evidence seemed to warrant the conclusion that he entered upon the discharge of his duty and the exercise of his powers in the premises as a public officer charged with the performance of difficult and delicate duties. Nor do we think the evidence warrants the conclusion that when he commenced the discharge of his duty in the premises he had formed a determination or conclusion not to summon a jury, or not to fully and properly execute his duty in the premises. It seems more reasonable to suppose that he entered upon the performance of his duties with reasonable and proper motives. It is but reasonable to presume that he, as a sworn public officer, fully intended to exercise the duties and functions of his office when he requested the superintendent to direct to be removed the remains to the vault for the purpose of being inspected by a surgeon.

The case was exceptional and unusual. A death had occurred in California. And if the death was unnatural or caused by criminal agencies the coroner may have supposed that the finding of the jury in a formal inquest would not be effective in aid of the execution of the criminal laws in the State of California.

There is evidence in the case tending to show that he entertained the idea of having a jury sworn and an inquest formally found immediately after the examination of the body had been had by the physicians at the house of Abbott, the sexton. It is not unreasonable to suppose that he was dissuaded from completing the inquest by the discussion had in respect thereto at the time.

While it is not important to determine on this occasion precisely what period of time the coroner abandoned the idea of impaneling a jury, it is important to give some consideration thereto in determining the questions which were made in respect to the defendant's knowledge thereof. We have found nothing, however, in the evidence which leads us to the conclusion that there was any preconceived design on the part of the coroner to omit to summon a jury. We are inclined to the opinion that he suddenly fell into an error in regard to his duty at the house of the sexton, perhaps in the innocent supposition that the ends of justice would not be subserved by further continuance of the proceedings incident to an inquest. If the coroner when he entertained the application of the defendant and received the affidavits and information in respect to the circumstances of the death of Irvine came to the conclusion that it was his duty to act in the premises and entered upon the discharge of the duty in the manner detailed by the evidence, without collusion or malice or wantonness, fully intending to do his duty in the premises, and took the several steps in performance thereof down to a period of time when it was possible for him to have impaneled a jury in the presence of the remains after the examination by the physicians, and then and there came to the conclusion improperly that the further continuation of the proceedings

of the inquest would be useless, though he were mistaken in such conclusion, we are of the opinion that he had not violated the statute against body stealing.

The witness Baker testified while at the vault he held a conversation with Dr. Reilly " about having a jury, and I said to Dr. Reilly there was enough within the bounds of the cemetery to make up a jury, and he asked if I would have them all come to the house, and I so ordered and they came. I think there were five men that came off the cemetery. I think there were nine men there then.   When I had sent for the men, I went back to the house and did not go in the vault again, and the men came and about that time Dr. Wey came over to the house.   *   *   And Dr. Wey said it was of no use ; that if there was anything found, to say that this man died from any causes other than natural causes, the whole procedure would have to go to California, and this jury would never be heard of again."

Dr. Wey is called later in the trial and testified that he did not say to Reilly on that occasion, " that the calling of a jury was all flummery ;   *   *   that the drawing of a coroner's jury was a piece of flummery, or all flummery."

In other respects, however, he does not contradict the testimony given by Baker tending to show that up to that time the coroner entertained an intention and commenced the execution of that intention by summoning jurors, and that he then and there fell into the error of omitting further to consummate the proceedings by a completed inquest.

But it is plain the defendant is guilty of the violation of that Statute " if she knew that the coroner was not to hold an inquest or do what he did without a coroner's jury."   Indeed such, in effect, is the tenor of the charge delivered to the jury.

The counsel for the defendant requested the Court to charge, as a proposition of law, viz. :  " That the fact that no coroner's jury was called or sworn does not constitute the crime of body stealing."   To that request the Court replied, " that is technically correct.   The fact that no coroner's jury

was called does not steal the body." Thereupon the defend-ant's counsel requested of the court to charge as follows : If the jury believes that the defendant requested the coroner simply to do his duty she is not responsible for any violation of law." To that the Court replied : " If she knew that the coroner was not to hold an inquest or to do what he did without a coroner's jury, she is responsible. And if she was attempting to use legal forms as a cover to accomplish the ulterior purpose of getting possession of the stomach of General Irvine, to coerce a set-tlement of her claims, and with malice and wantonness, she is responsible."

The defendant's counsel then asked the Court if there was a refusal to charge the request and the Court replied, " Yes sir ; further or other than I have already charged."

An exception was taken by the defendant and a further re-quest made, viz.: " I asked your honor to say to this jury that there is no evidence in this case that this defendant knew or had cause to know, that Coroner Reilly would not call a jury." To that request the Court replied, viz. : " There is no evidence of which I am aware, further than or other than the fact that she had instruction from Mr. Collin of the necessity of a coroner's jury, and there is no evidence that she asked to have a coroner's jury, and that Mr. Nealson, her detective, who was here under her employ, as I understand, for a per diem compensation, was present at the time without the sug-gesting of a coroner's jury, and that there was no suggestion from any quarter except from Mr. Baker that a coroner's jury was necessary. And under all the circumstances of the case I think it is for the jury to say whether there was a purpose on the part of Coroner Reilly to call a jury, and whether she knew it."

To that refusal there was an exception and also to the qualification. Thereupon the defendant's counsel asked the Court to charge that it was not necessary for this defendant, when she requested Coroner Reilly to make an examination, to ask him also that he should call a jury. To that request the Court replied : " That would be so if there was no know-

ledge on ner part that he did not intend to call a jury and no
intention on her part that he should not call a jury." The
counsel for the defendant accepted.

We think the court fell into an error in refusing to yield
to the requests, which we have already quoted, and that the
defendant was entitled to have the jury instructed in accord-
ance with the tenor of said request; we are not able to say
that the jury would have reached the same conclusion had
they been told that it was not necessary for her " when she
requested Coroner Reilly to make an examination," to ask
him, also, that he should call a jury.

It does not appear by the evidence that in an interview
she held with the coroner at the time the affidavits were pre-
sented and the information communicated which led him to
act, that she demanded of him that he discharge his duty in
the premises. As we have already seen, a part of that duty
was the impaneling of a jury and returning and filing a for-
mal inquest.

The foregoing views lead to the conclusion that the convic-
tion and judgment should be reversed and a new trial
ordered.

Upon the appeal to the Court of Appeals the following
were the principal points raised by counsel.

*Jacob Schwarz*, for defendant, appellant.

I. Any coroner of Chemung county had jurisdiction to
hold an inquest over the body of General Irvine. Smith on
Coroners, 620.

Whenever information comes to a coroner that a person
has died suddenly under such circumstances as to afford a
reasonable ground that the death was occasioned by criminal
means, the law makes it the duty of that coroner to go to the
place where the body is and investigate the cause of death.
Code Crim. Pro., sec. 773.

There is no statute nor decision of any court of this or any
other state which excludes from the jurisdiction of a coroner
a body buried in his county where the death has occurred
elsewhere.

In the absence of any such limitation the general wording of section 773 gives a coroner the right to hold an inquest over any body found within his jurisdiction.

In the present case no one has questioned that the information given to the coroner was sufficient to set his judicial powers in operation.

It is nowhere prescribed in what form such information shall come. A verbal statement, if creditable, and if credited by the coroner, may be sufficient. In the present case verbal information was backed up by affidavits of the only disinterested persons living who could give information.

*Jno. B. Stanchfield*, district attorney, for the people, respondents.

I. The death of Irvine having taken place in the state of California, and the interment of the body in the county of Chemung, in the state of New York, a coroner in that county had no jurisdiction to act in the premises. Under the English law, prior to 1848, it was held where an inquisition was taken by the coroner of the borough of Reading on the oath of jurors of that borough in Reading upon a body lying dead in the borough, and it appeared that death was accidentally caused by the deceased falling, in the county of Berks, from a carriage, and the deceased died in the borough, the Court of Queen's Bench quashed an inquisition upon the ground that the coroner of the borough had no jurisdiction to inquire into the cause of a death occasioned by an accident happening out of the borough. *Reg.* v. *Great Western Railway Co.*, 3 Q. B., 333; 42 E. C. L. R.

After, and in consequence of that decision, as more fully appears in 1 Russell on Crimes, 754, an Act for the more convenient holding of coroners' inquests was passed, the language of which recites, that "It often happens that it is unknown where persons lying dead have come by their deaths, and also that such persons may die in other places than those in which the cause of death happened," and enacts "that the coroner within whose jurisdiction the body of any person

upon whose death an inquest ought to be holden, shall be *lying* dead shall hold the inquest, notwithstanding that the cause of death did not arise within the jurisdiction of such coroner."

Thus by special statutory enactment the coroner within whose jurisdiction a body shall be found *lying* shall have the right to act.

The language of section 773 of the Code of Criminal Procedure, is the same as was the English law prior to the enactment of, the amendatory statute above quoted. There being in it no language which gives the coroner of the county within which a body shall be lying, jurisdiction to act, it is insisted that an amendment similar to that passed in England is necessary before the coroner in this state can obtain jurisdiction to exhume a body where the death occurred in another and a foreign jurisdiction.

A coroner has, in this state, no other or different rights, powers or duties than are conferred upon him by express provision of the statute. Every statutory provision now in force with reference to coroners is contained in the Code of Criminal Procedure.

The language of the Indiana statute reads as follows : it is made the duty of every coroner "as soon as he shall be notified that the bead body of any person supposed to have come to his death by violence or casualty, is within his county," to issue his warrant and institute proceedings for a proper inquest. Under that peculiar phrasing of the statute it was held in *Jameson* v. *Board of Commissioners of Bartholomew county*, 64 Ind., 524, that the coroner obtained jurisdiction over a dead body within his county, and as such, could legally employ expert skill to determine whether or not death had resulted from the administration of poison.

II. The failure of the coroner to procede in the manner required by the code of Criminal Precedure was a jurisdictional defect and made him and all interested with him, whether present or absent. trespassers and criminally amenable to the law *ab initio*.

Section 773 of the Code of Civil Procedure, as hereinbefore cited, states that upon his arrival at the place where the person is, he must forthwith summon not less than nine or more than fifteen persons, qualified by law to serve as jurors, to appear before him forthwith at a specified place, to inquire into the cause of the death or wound.

Section 774 provides that when six or more of the jurors appear, they must be sworn by the coroner to inquire who the person was and when, where and by what means he came to his death or was wounded, as the case may be, and into the circumstances attending the death or wounding, and to render a true verdict thereon according to the evidence offered to them arising from the inspection of the body.

Section 775 provides, the coroner may issue subpœnas for witnesses, returnable forthwith, or at such time and place as he may appoint. He must summon and examine as witnesses every person who, in his opinion or that of any of the jury, has any knowledge of the facts ; and he must summon as a witness a surgeon or physician who must, in the presence of the jury, inspect the body and give a professional opinion as to the cause of the death or wounding.

It is not contended on the part of the defense, that any of the provisions of §§ 773, 774, or 775 of the Code of Criminal Procedure were complied with in this case.

A coroner is an officer of limited jurisdiction. He must proceed according to law.

III. There was sufficient evidence that the coroner did not attempt or even contemplate the holding of an inquest with a coroner's jury.

Dr. William C. Wey says: " Nothing was said on the subject of a jury while he was there or before he went there" until the affair was over.

The defendant Fitzgerald stated that " she wished the body to be taken up and the stomach analyzed to see if there was any trace of poison," also, she made the remark that "the evidence should be produced if it was there;" likewise she said the coroner was to gain " what evidence she wished to

use." And defendant Fitzgerald stated she " came here to have the body of General Irvine taken up and the stomach exhumed and she proposed to stay here until it was done."

The coroner exhumed the body, opened the coffin, dissected the remains, carried away the stomach, the gall-cyst, the duodenum and some other portions of the internal viscera in fruit cans and flour sacks, and returned the mutilated remains to the coffin for re-burial, and it was re-interred without the slightest notion on his part of holding a lawful inquest by a coroner's jury.

The only suggestion of a coroner's jury came from the witness Baker; and that not until the offense had been committed.

IV. The removal of the body of Irvine and the examination made of it by the physicians and the carrying off of certain portions of the internal viscera for the purpose of chemical examination, constituted in law and under the section of the code that this indictment is framed, the crime of removing a dead body for the purpose of dissection.

V. In this state a coroner's Court is not a Court of record. It is a Court of inferior jurisdiction. A magistrate of a Court of inferior jurisdiction, not of record, when sued for an act done by him in his official capacity, in order to justify, must show that he had authority to do the act complained of. Nothing will be implied in his favor. *Crisfield* v. *Perine*, 15 Hun. 201. At common law it was essential to the validity of a coroner's inquisition, that the jury should view the body. *Rex* v. *Ferrand*, 3 B. & Ald., 260. Such is our statute.

The following opinion was delivered by the Court of Appeals:

RAPALLO, J.—The facts of this extraordinary case are fully stated in the dissenting opinion of HARDIN, J., at General Term. We should content ourselves with concurring in that opinion were it not that it simply orders a new trial for errors in the charge and for refusals to charge, while we think that it should have gone further, and have held that the facts

of the case did not establish a crime punishable under the statute against body stealing, (Pen. Code, 311), under which the prisoner was indicted and convicted, and which is in the following words: "Sec. 311. A person who removes the dead body of a human being, or any part thereof, from a grave, vault, or other place where the same has been buried, or from a place where the same has been deposited while awaiting burial, without authority of law, with intent to steal the same, or for the purpose of dissection, or for the purpose of procuring a reward for the return of the same, or from malice or wantonness, is punishable by imprisonment for not more than five years, or by a fine not exceeding one thousand dollars, or both." This statute describes every kind of "body stealing" known to the law. The addition inserted in the Penal Code, "or for the purpose of obtaining a reward for the same," was the only substantial change made since the Revised Statutes in the definition of this heinous crime.

The intent of the statute is manifest. It certainly was not intended to apply to exhumations made by legally constituted public authorities, for the purpose of ascertaining whether crime has been committed in producing the death of the person whose body is exhumed. When the exhumation is made, not secretly, but publicly, on open application to the officer charged with the duty of inquiring into the cause of death of any person whose body is brought within his jurisdiction, it is a total misapplication of the statute against body stealing to use it for the purpose of imposing its punishment on all persons concerned in the exhumation, in case any proceedings of the officer under whose direction it was made should be found to be irregular.

The irregularity alleged in this case in the conduct of the coroner is that he did not impanel a jury before he ordered the *post mortem* examination to be made by the physicians whom he summoned for the purpose. A sufficient number of persons to form a jury was assembled by direction of the coroner, but the jury was not sworn and impaneled. I refer to the opinion of Judge HARDIN as correctly stating the

23

facts, which we have verified by an examination of the testimony. The point of law is debatable whether a *post mortem* should take place before the coroner has impaneled a jury. But it is settled that the *post mortem* should not be in the presence of the jury, and that they are to be instructed by the testimony of the physicians who are designated by the coroner to make it. The dissection by order of the coroner is expressly authorized. Pen. Code, 308; *Crisfield* v. *Perine,* 15 Hun, 202; affirmed, 81 N. Y., 622. If, as in England at one time, the findings of the coroner's jury were to stand as an indictment by a grand jury, some point might be made on behalf of the accused as to the validity of the inquest in such a case as this. But to resort to those questions for the purpose of supporting an indictment for body stealing under the circumstances of this case, is quite unreasonable.

In the present case the defendant communicated to the coroner in the form of affidavits, whether legally authenticated or not is immaterial, information which should have induced any magistrate not neglectful of his duty to believe that he ought to investigate the matter presented to him. Those affidavits made a strong case to lead the coroner to believe that a murder had been committed, and that an examination of the body, which was within his jurisdiction, would disclose the fact. The defendant sought an examination of the body. She asked the coroner to do his duty, and to examine the body. Whatever motives may have influenced her, no one can suppose that, however unfounded her belief might have been, there was not sufficient in the papers she presented to the coroner to justify his action, and there is no pretense that the affidavit of Dr. Worter, which she produced, had been in any manner influenced by her. Her silence during several years after the death of Gen. Irvine is the main argument against the *bona fides* of her charge, and it is said that her desire was not so much for the punishment of crime as to obtain some pecuniary advantage for herself by making defamatory charges. However this may be, if she committed a wrong, it was not the crime of body stealing,

and on this ground the conviction, and the judgment of the general term affirming it should be reversed, and the prisoner discharged.

Judgment reversed and the prisoner discharged.

All concur.

NOTE. For a case of body stealing, see *People* v. *Thomsen,* 3 N. Y. Crim. 552. See also next case, *People* v. *Richards.*