## Don Gray v. The State.

### No. 4088.    Decided November 11, 1908.

### Rehearing December 14, 1908.

#### 1.—Murder—Provoking Difficulty—Question of Law—Question of Fact.

It is well settled in this State by an unbroken line of decisions that no defendant in any case can be or has ever been held to be guilty of provoking a difficulty unless his intent so to do was gathered from the testimony. It is equally well settled that this question of intent is a question for the jury.

#### 2.—Same—Craftiness—Design.

The issue and matter of provoking a difficulty implies of necessity a certain craftiness and design. It implies of necessity an intent and purpose on the part of the person killing, and a disposition or purpose to do some act, the effect of which shall be to cause his adversary to attack him. Whether such design exists in any given case is a question of fact for the jury.

#### 3.—Same—Case Stated—Self-Defense.

Where upon trial for murder the evidence did not conclusively show that the acts and conduct of the defendant at the time were of such nature and character as would as a matter of law make him guilty of provoking a difficulty so as to cut off wholly his right of self-defense, the issue is one of fact for the jury.

#### 4.—Same—Insult to Female Relative—Explanation—Right of Going Armed.

The law gives a person who has been aggrieved by the language or conduct of another the right to seek of him an explanation, and to arm himself if his purpose be for his own protection only in the event of an attack by his adversary; and if as in this case, the insult of deceased towards defendant's wife had so wrought upon the defendant's mind as to render it incapable of cool reflection, he could not be held to forfeit his right of self-defense by a precipitancy of speech, insulting in its nature, and thus be held responsible for provoking a difficulty, without submitting this fact to the jury.

#### 5.—Same—Self-Defense—Disinterment.

Where upon trial for murder the defendant had been convicted of manslaughter and the evidence did not conclusively show that the acts and conduct of the defendant at the time were of such nature and character as would, as a matter of law, make him guilty of provoking a difficulty so as to cut off his right of self-defense, the court can not assume that further evidence on the subject of self-defense, which could probably be shown by the disinterment of the body of the deceased, would be immaterial and would not strengthen his plea of self-defense and not result favorably to the defendant. Brooks, Judge, dissenting.

#### 6.—Same—Mitigation of Punishment—Exhumation of Dead Body.

Upon trial for murder, which resulted in a conviction of manslaughter, if the exhumation of the body of the deceased was authorized, it can not be said that the same would have been immaterial where the question at issue was whether the first shot fired by the defendant upon the deceased entered the breast or the back of the deceased. Defendant would have been entitled to all testimony which might have the effect to mitigate his punishment, and such testimony would have been admissible.

#### 7.—Same—Right of Exhuming Dead Body—Public Policy—Administration of Justice.

It is evident on the authorities both in this State and elsewhere that neither the right of sepulture, nor the right to have the body of the dead remain untouched and unmolested is an absolute and fixed right, but these rights must and should yield when they conflict with the public good or where the demands of justice require such subordination.

#### 8.—Same—Inherent Power of Courts—Disinterment of Body of Deceased.

Courts were instituted among men for the purpose of promoting justice,

the ascertainment of the truth in all controversies pending in such tribunals and for the protection of life, liberty and property; and the district courts of this State, in proper cases of imperative necessity, have the inherent power to order, if need be, the disinterment of the body of a deceased, in trials for murder, to ascertain the truth respecting the homicide, in the due administration of justice; and this power pertains as well in the interest of the accused as the State.

### 9.—No Statutory Provision.

The provisions of the Code of Criminal Procedure with reference to disinterment seem only to relate to preliminary investigations, and not to trials after indictment is pending.

### 10.—Same—Case Stated—Commission of Experts—Exhumation.

Where upon trial for murder the defendant's testimony was direct and positive that the first shot fired by him at the deceased was fired in the latter's breast, and while deceased was advancing upon him with a drawn knife, and the theory of the State was that the deceased was shot in the back, and also from behind in his hip and just above his ear, and it appeared that there were no eyewitnesses; that the State's witnesses who examined the wounds of the deceased were not physicians, and that their examination was not made with any special care; that the true facts as to the entrance of the bullets were shrouded in great doubt; that the defendant at the first and every subsequent trial made an application to the court, in writing, under oath, setting up the facts in proper manner and at the proper time, that the entrance, range and lodging of the bullets which killed deceased could only be ascertained by a commission of experts after the body of the deceased had been exhumed and examined by them, etc., and that exhumation of the body of the deceased was refused by his relatives, it was reversible error to refuse said application.

Appeal from the District Court of Burnet. Tried below before the Hon. Clarence Martin.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*Flack & Dalrymple, Ike D. White, T. E. Hammond* and *McLean & Spears,* for appellant.—Where the interest of justice demands it the court can and should require the exhuming and examination of a dead body. Wharton & Stille's Med. Juris., p. 539, sec. 527 (last edition); Granger's L. Ins. Co. v. Brown, 57 Miss., 308; 34 Am. Rep., 446; 3 Wigmore on Evidence, secs. 2194, 2219, 2220, and notes.

It is often necessary to accomplish the ends of justice that a dead body should be disinterred. Fears v. Nacogdoches Co., 71 Texas, 337; Rutherford v. Harris, 3 Ct. App., sec. 114.

Under the laws of this State prior to 1893 it seems there was no provision for making the expense of such a proceeding a charge upon the county. Fears v. Nacogdoches Co., 71 Texas, 337; Galveston Co. v. Ducie, 91 Texas, 669; 45 S. W. Rep., 799; Frio County v. Earnest (Texas. Sup.), 16 S. W. Rep., 1036; Contra: Rutherford v. Harris Co., 3 Ct. App., sec. 114.

But defendant offered to pay the cost of the proceeding, and besides, by article 1024a, Code of Criminal Procedure, enacted in 1893, the cost of such autopsy is made a charge against the county.

A coroner's inquest is a proceeding by and on behalf of the

State, and is instituted for the detection and punishment of crime. Fears v. Nacogdoches Co., 71 Texas, 337.

It is not a remedial process to which a defendant may resort for the discovery and perpetuation of evidence in his behalf. This right can only be enforced through the courts before which he is called upon to answer; in the exercise of their inherent and equity powers.

*F. J. McCord,* Assistant Attorney-General, *Dayton Moses,* District Attorney, and *Slator & Oatman* and *W. C. Linden,* for the State.— Cited cases in opinion.

RAMSEY, Judge.—On January 12, 1907, in the village of Valley Springs in Llano County appellant shot and killed Will Phillips. This much was admitted. The appellant was at the time a young man some twenty-three years of age living on a ranch some miles away from the scene of the homicide. The deceased was a man about forty years of age and had been staying at the house of appellant for a short time before the killing engaged in trapping wolves. The parties were well acquainted and for many years had been very close and intimate friends. Deceased left the house and employment of appellant on the day before the homicide. The shooting occurred on Saturday. On the day before, appellant's wife advised him of a gross and serious insult offered her by Phillips at their home in appellant's absence. This fact was attested by the testimony of appellant, his wife and one Gordon Mays, his brother-in-law, and furnishes the only suggestion of any difference or ill-will between the parties. On the day of the homicide deceased was in the village of Valley Springs at or near the store of one Mays when appellant accompanied by Gordon Mays drove into town in a buggy. The store where appellant was fronted north with a front gallery extending on the east side for some little distance back. There was a door at the south end of the building. Soon after his arrival in town appellant accosted deceased and said to him that he desired to see him. A number of persons testify to having seen appellant and deceased engaged in conversation some ten or twenty yards from the southeast corner of the store building. Deceased was seen to have a knife in his hand whittling. There was no loud talk, nor does anyone except appellant undertake to give any account of any portion of their conversation. There was no exhibition at the time of any unfriendliness and there was no loud or boisterous talking or anything to indicate that the conversation was in anger. After talking some little while, appellant and deceased left the place where they had been standing, deceased going rather in front, and when they had reached a position out of sight of any of the parties on the east gallery, three shots were heard, fired in rapid succession and almost immediately deceased was seen coming in

at the south door of the store limping badly, and after having advanced some ten to twenty feet inside of the store fell or sank down near some nail kegs and expired without having said a word. Very soon after deceased appeared at the doorway appellant also came from the same direction and through the same door with a pistol yet in his hand. Appellant's testimony was to the effect in substance that after he and deceased retired a little distance to themselves away .from the store and the crowd, he, in substance, asked the deceased if he had not been treated right at his house to which deceased replied that he had; that thereupon appellant asked him why he had treated Nora, his wife, in the manner he had, to which deceased replied that he did not blame him for being mad but he didn't intend to take any of his abuse; that appellant then told him that he had abuse for him and he would have to take it and that deceased in the meantime was walking rather towards the door of the store, and almost immediately before getting to the door, turned around to him and said to him in an angry manner, "Shut up," to which appellant replied, "You will have to make me," and the deceased started at him with a knife saying that he could or would make him shut up, and that defendant fired in his own self-defense, striking deceased in the breast; that deceased then rather turned and defendant continued to rapidly shoot until he had fired two other shots. The testimony showed that there was one wound in deceased's body just under and below the shoulder blade behind and another one in line with but somewhat higher and some three or four inches above the left nipple, and another one in his hip behind, and that in deceased's groin there was a flattened bullet lodged just under the skin. There was another wound just over the ear some inch or two inches long and probably a half inch wide. It was the theory of the State that the wound in the back under the shoulder blade was the point of entrance of a bullet and the same emerged in front but slightly above the left nipple. They further contend, which was obvious, that another shot entered behind in his hip and lodged in his groin, and that the third shot had taken effect just above his ear. This, of course, was not consistent with appellant's contention which was to the effect, in substance, that the wound in the breast was a wound of entrance and that the shot under the shoulder blade and in the hip represented the evidence of the other two shots and that the wound in the head was not caused by a bullet but due to a fall. Appellant was indicted in the District Court of Llano County on May 1, 1907. The precise date of his arrest is not shown by the record. On May 8, 1907, appellant filed in said court his motion in writing under oath setting up the fact in substance, that when he fired the first shot at the deceased the said deceased was facing him and was in the act of making an assault upon him with a drawn knife, and that the theory of the defense was that the first shot entered the body of deceased and

was fired by the defendant in his own self-defense, while there would be testimony introduced by the prosecution tending to support their contention that all the wounds in the body of the deceased were made from the back; that the evidence would show that there was no eyewitness to the tragedy, or to the position of the deceased when the first shot was fired, except himself; that the facts were that the first shot so fired took effect in the breast and did not pass through the body of deceased but lodged therein and that the other shots fired were fired in rapid succession as deceased turned away, and inflicted the wounds in the back part of the body, neither of which shots passed through the body but lodged therein and that there were then three bullets in the body of said deceased, all of which could have been, and could yet be definitely ascertained by an autopsy of the body of deceased. It was further averred in said motion that no examination was made of the wounds in the body of deceased; that said wounds were not probed so as to ascertain their range or depth, and that a very indifferent examination was made of the external appearances of said wounds and that no specific examination, other than to casually look at them, was made of said wounds, as to their external appearance or otherwise, by any person of knowledge or experience in such matters. That the body of deceased was taken in charge by the relatives and friends of deceased and interred in the cemetery at or near Valley Springs in Llano County, Texas, on or about the 13th day of January, 1907, the exact location of which is well known and can be pointed out by the citizens of that vicinity, and where said body now remains interred and over which the defendant never had, and has not now, any character of right or control; that he is informed and believes it is within the power of this court to appoint a commission of reputable and competent physicians and surgeons to make an autopsy of the body of deceased, and order that said commission cause the body of deceased to be disinterred and that such commission make such thorough examination of said body as will enable them to give definite and reliable testimony of the character of said wounds, their range and depth, and as to the number of bullets lodged in the body of said deceased. He further averred in said motion that if the law does not provide for the compensation of such commission, he will cause to be deposited, and now tenders into this court such reasonable sum of money as may be fixed by the court with which to pay the reasonable costs and expenses of such commission, including a reasonable compensation to such commission; that there was no eyewitness to the firing of the first shot, who saw the positions of both defendant and deceased, and that such examination is material to the defendant upon the trial of his cause in that the result of same would show that the wound in the breast of deceased entered from the front. It is further averred that the failure to make such examination of such wounds was not by his procurement or consent and he knows of

no other source from which the evidence herein sought could be procured, except by and through the procedure herein sought, and that it never has been within his power and never can be within his power, to have such examination made and to obtain the benefit of the result thereof, except through the power of this court, the exercise of which is now prayed for; that this application is not made for delay but that justice may be done. Wherefore, he prayed for the appointment of a commission of such number of reputable and competent physicians and surgeons as the court may deem proper, and that they be ordered to cause the body of deceased to be disinterred and that they make such examination of the body as shall be necessary to ascertain the nature, range, character and depth of the wounds therein and the number of bullets lodged in said body and that the trial of this cause be postponed to a future day of this term or the cause be continued as the court may deem proper, until the next term of this court to await the result of such examination of said body by such commission now prayed for. This motion when originally filed was antagonized by the district attorney in writing, under oath, in which it was claimed that same should not be granted for these reasons:

1. Said request was made for delay and not that justice should be done.

2. That neither this court nor the attorneys representing the State have any authority to order that said deceased body shall be disinterred. 3. Again, it was alleged that the wounds on the body of deceased were examined by a number of credible citizens of Llano County, before its burial and said persons so examining said body are in attendance on this court at this time as witnesses in the case and by said witnesses the facts sought to be obtained in the appointment of the proposed commission can be easily and accurately established. The granting of the motion was also opposed on the ground that deceased was killed on the 12th of January, 1907; that appellant was arrested on the same day for said killing and at once employed counsel to defend him; that the body of deceased was not buried until the afternoon of the next day; that the examining trial was thereafter begun on January 17, 1907, and was not concluded until the 19th day of the same month when appellant was again released on bail and was not thereafter arrested until the return of the indictment against him and that during all this time no request was made by appellant or any of his counsel, or the State's attorney, or the relatives of the deceased or the magistrate who conducted the trial to have such commission appointed. Substantially the same motion was thereafter presented to the court on the 26th day of November, 1907. The case many months after the indictment was transferred on change of venue to Burnet County, after two trials had been had in the county where the homicide occurred. On January 6, 1908, the original motion was again presented to the court and by

the court overruled. On January 8, 1908, the appellant filed a supplemental motion re-affirming all the allegations in his original motion and averring that the wife of the deceased and his father, who are named, were actively engaged in the prosecution of this cause in that they had employed certain eminent counsel to assist the prosecution of appellant on the charge of murder; that Mrs. Phillips, wife of deceased, and others had brought a civil suit against him for the recovery of a large sum of money as damages for the alleged unlawful killing of the deceased and that his said wife and other kindred so engaged in the prosecution of this cause and in the prosecution of said civil action have the right or power to permit or cause the body of deceased to be exhumed and the examination as sought made, but that the said parties and their counsel well knowing the conflict in the evidence as has been demonstrated by two trials of the case, and well knowing the vague and unreliable character of evidence on the part of the State, as to how and in what manner the wounds in the body of the deceased were inflicted and well knowing the importance of the evidence to be obtained by an examination of the body of the deceased, and especially the importance of determining the fact as to whether or not there are not three leaden bullets in the body of the deceased, which fact would conclusively prove or disprove the truth of defendant's theory that the first shot was fired into the breast of the deceased, while the deceased was in the act of making an assault upon the defendant with a drawn knife, and well knowing all the aforesaid efforts on the part of this appellant to procure such examination, have failed and refused to acquiesce or concur in said motion, but on the contrary have withheld and are withholding their concurrence or acquiescence therein for the purpose, as he charges, of perpetrating a fraud upon him and causing him to be unjustly convicted and to enable them to recover, against him unjustly, damages for said killing. It is averred in the last named motion that there was ample time if the original motion had been granted for such disinterment and examination to be made and the evidence discovered so as to have been used at each of said trials without any delay or postponement of the cause, and that the examination could yet be made in ample time for the evidence of the facts found thereby to be used in evidence on the trial at that term of the court without delay or postponement; that if the law does not provide for the expense and compensation of such commission, he will cause to be deposited and now tenders into this court such reasonable sum of money as may be fixed by the court with which to pay the reasonable cost and expense thereof. In addition to the reasons urged on the trial why appellant's request should be refused, it is now contended by the State that the evidence shows that appellant provoked the difficulty, and that he is, as a matter of law, under the facts shown, debarred from any right of self-defense.

It would be conceded, we assume, that if the evidence showed incontestably such facts as would have justified the court in declining to submit to the jury the issue of self-defense at all, it would of necessity follow that the evidence sought by appellant would not have availed him anything, because since he was convicted of manslaughter, if he provoked the difficulty with a view of injuring the deceased, he would be guilty of the offense for which he was convicted.  So that, we are confronted with the question as to whether it can be said, in fairness, that the testimony showed beyond controversy that appellant provoked the difficulty, in the legal sense; that is, as to whether or not his conduct and acts toward deceased were done with the intention of bringing about a difficulty. It does not need to be said that the learned trial court tried the case on the supposition and theory that it was a matter of fact to be found by the jury as to whether appellant by his acts and conduct, in the legal sense, provoked the difficulty with the deceased.  We held in the case of Young v. State, 53 Texas Crim. Rep., 416; 110 S. W. Rep., 445, on a review of all the authorities, that where there is no intention of provoking a difficulty in order to kill a person or do other unlawful violence to him, that notwithstanding the acts and conduct of the defendant, though not intended by him to do so, had the effect of inducing his adversary to assault him, the assaulted person does not thereby lose his right of self-defense. Such was the holding of the court in Franklin v. State, 34 Texas Crim. Rep., 286, and is supported by the cases of Winters v. State, 37 Texas Crim. Rep., 582; Vann v. State, 45 Texas Crim. Rep., 434, and Garza v. State, 48 Texas Crim. Rep., 382; 88 S. W. Rep., 231.  The true rule, as stated by Judge Hurt in the Franklin case, supra, undoubtedly is, "Again, and as we have already said, one may be guilty of a wrongful act, which produced the necessity to kill, and be guilty of no offense, though he take life.  If the act, though wrongful, be not illegal, and be not intended to provoke a difficulty, nor reasonably calculated to produce the occasion and necessity for taking life, and the party kill to save himself, he is justified." The same rule is laid down in the case of Winters v. State, 37 Texas Crim. Rep., 582, in which it is said:  "As an abstract proposition, it is true that a party can not avail himself of a necessity which he has knowingly brought upon himself; and if a party wrongfully produce a condition of things, wherein it becomes necessary for his safety that he should take life or do serious bodily injury, then the law imputes to him his own wrong.  But the charge fails to inform the jury what wrongful acts deprive a party of the right of self-defense.  The character of provocation, in connection with the intent, should have been defined and set out in a separate and affirmative charge given on behalf of the State."  In the later case of Vann v. State, 45 Texas Crim. Rep., 434, it is said:  "Under

all the authorities, and under the law, in order to constitute provoking a difficulty, there must be something said or done by the accused with intent to produce the occasion or bring about the difficulty which makes him responsible criminally." Again, in Garza v. State, 48 Texas Crim. Rep., 382; 88 S. W., 231, it is said: "The charge of the court seems merely to cut off the right of self-defense if Pedro and those with him sought the occasion regardless of the doing of some act calculated to bring the difficulty about." It is not questioned that in this case there was strong evidence tending to sustain the State's plea of provoking a difficulty. This was recognized in the court below, and an unexceptional charge given in respect thereto, but after all it was a question of fact, assuming the worst view of appellant's conduct, as to whether or not in his conversation with deceased it was his purpose to provoke a difficulty, or that he had any intent or wish so to do. On this question the case of Carter v. State, 37 Texas Crim. Rep., 403; 35 S. W. Rep., 378, seems very much in point. In the first place, it is there held in terms that "Where there is no intention to provoke a difficulty with a view of entering into a fight with his adversary, the person giving the provocation does not lose his right of self-defense." It is there further said: "Again, a party may be provoked into a difficulty, but the party giving the provocation does not lose his right of self-defense unless he intends to provoke the difficulty with the view of entering into a fight with his adversary. The main question for the decision of the jury is the intention with which the provocation was given, and this should be stated in the charge. In every case involving the question of provoking the difficulty, if the defendant provoked the difficulty or produced the occasion for the purpose of inducing his adversary to make the attack, so that he could kill him, why this is murder. If there is no felonious intent, the party intending an assault and battery, and he is forced to kill to save his life, this is manslaughter. But, unless there is an intention to have a difficulty, his right of self-defense remains complete. Some acts may be committed, of such a character as to carry the intent with them. This, however, is a matter for the jury. The court should, in all cases, submit the intention with which the provocation was given." This decision not only is a clear and luminous statement of the law, but is directly in point, and seems to have been the guide of the court below in the trial of the case. To the same effect see Shannon v. State, 35 Texas Crim. Rep., 2.

In view of the fact that two trials had been had, resulting in failures of juries to agree, that many months had intervened between the filing of the original motion and the date of the last trial, it must be obvious that the first ground of the objection of the district attorney that the motion was made for delay, can not be sustained. Whatever may be thought of the authority of the court

to make the order requested, if, on the trial, it should have resulted that the facts sought to be obtained by the appointment of the proposed commission were accurately and incontestably established, whether the court had authority so to grant said application or not, we would not be justified in reversing the case, because if the facts were made certain by the testimony of the witnesses, the appointment of the commission, whether authorized or not, would have become immaterial. An inspection of the record, however, has not convinced us that the facts sought to be established by the appointment of the commission were either accurately or incontestably established. It may be conceded that there was a strong showing made by the State that all three of the shots entered the body of the deceased from behind, and, yet, based not only on the testimony of appellant but the testimony of other witnesses this fact is seriously disputed and left, as we believe, in great doubt. We deem it unnecessary, in view of the length of this opinion, to set out all the facts touching this matter. The following brief summary is sufficient:

The State introduced a number of witnesses including J. J. Smathers, S. N. Lively, Will Bleacher and J. B. Winkler, all of whom testified in substance that the wound in the right hip was a smooth round hole, the flesh slightly puckered in and that the wound in the right shoulder was of the same nature; that is, a small round hole, no ragged edges of flesh and having the appearance of the flesh being pressed in; whereas, the wound on the left breast was ragged, larger than the other wound and the tissues of the flesh seemed to be protruding. Some of the witnesses for the State testified in respect to the wound in the head that the hair seemed to be pressed rather forward. Probably the strongest statement of the character of the wound in the breast is made by the witness Lively, who says the wound in the breast was "a ragged, rough looking hole, the tissues and flesh pushed out and that this wound in the breast was a right smart larger than those in the back." None of these witnesses were physicians or had had any particular experience in reference to wounds, nor was their examination made with any special care, or for the special purpose of ascertaining the particular nature of the wounds, but was made in the course of preparing the body of deceased for interment. The wounds were not probed except some of the witnesses with a lead pencil or matches, pressed cotton into the wounds to keep them from bleeding. The whole examination was made without any special reference to determining the nature and character of the wound or the entrance or range of the bullets. To meet this testimony appellant introduced among others, Dr. Fowler, who testified that the "wound in the breast seemed to be pretty much the same size as the wound in the back," but that when he examined all the other wounds they had been plugged and that his examination was very casual. Ed Reagor,

another witness for appellant, testified that all the wounds looked about the same size and character to him. Such also was the testimony of J. A. Mays, as well as Earl Avery and W. C. Avery, both of whom testified in substance that they could see no difference in the size or appearance of the wounds. In addition to this appellant introduced two physicians, Dr. Livingston and Dr. Brownlee, both of whom testified as experts and both of whom said, in substance, that as to the character of wound made by a bullet entering the human body much would depend upon the nature of the flesh where the entry was made; that a bullet entering the fleshy part of one's person would ordinarily make a round smooth hole and the hole would be rather smaller than the bullet making it; whereas, on making its exit from the body the hole would usually be somewhat ragged and slightly larger than the bullet entering the body. They both agreed, however, that as to the size of the hole much would depend on the portion of one's person the bullet entered and both agreed that if one were shot over the rib or other bony substance, or even between two ribs, where the flesh was tightly drawn, that the wound would be much larger and more likely to be ragged in appearance than if made in the fleshy portion of one's person. There was also testimony to the effect, in substance, that deceased had fallen against, or at least near some nail kegs and it was sought to be shown that the wound in the head was not made by a bullet at all but must have been the result of a fall. The physicians also testified that if the wound in the head had been made by a bullet as close as appellant and deceased were together that it probably, if not indeed, inevitably would have had the effect by concussion to have so stunned deceased that he must have dropped or at least would have been unable to walk. The testimony further showed that deceased when found was resting on his side and there was some testimony by the physicians tending to show that while so resting on his side the effect of the blood passing out through the wound must have caused the fleshy tissues to protrude from it. Again, some support was found for appellant's theory in effect that no bullet holes were ever found in or near the northeast side of the store where the shooting occurred or elsewhere in the house, as probably would have been the result if two bullets had passed entirely through the body of deceased. Appellant's testimony is direct and positive that the first shot fired by him at deceased was fired in front and while deceased was advancing upon him with a drawn knife. Whatever may be our personal views of the case, it is to our mind evident that the true facts were shrouded in great doubt as the matter was ultimately left. On the other hand it is certain that if an autopsy had been made, the truth would have been demonstrable by such examination, because, if appellant's theory is true there would have been found three bullets in the body of deceased; whereas, if the theory of the State is true, there would have been in the body

of deceased only one bullet and that the one discovered by the witnesses in the deceased's right groin. So that we are confronted with the question as to whether or not the court had authority to make the examination requested, and whether, having the authority, it should, under the facts of this case, have done so. Our opinion is that both these questions must be answered in the affirmative. It was said in the case of Granger Life Insurance Company v. Brown, 34 Am. Reports, 446, where an application had been made by an insurance company for the disinterment of a body that the court was "not prepared to say that in a proper case the court, in the interest of justice, should not compel the exhuming and examination of a dead body which is under the control of the plaintiff, if there is likely to be accomplished, and the defendant has exhausted every other method known to the law of exposing it. We are prepared to say, however, that such an order should be made only upon a strong showing to that effect." The motion in that case was denied, however, on the ground that there had been too great delay in making the application. A similar rule is laid down in 3 Wigmore on Evidence, sections 2194, 2219 and 2220. It is said: "At common law there can be no property in a dead human body; and after burial of such dead body it becomes a part and parcel of the ground to which it is committed." Nevertheless, the authorities hold the right to bury a corpse and preserve its remains is a legal right which the courts will recognize and protect. While the body is not property in the usually recognized sense of the word, yet it may be considered as a sort of quasi-property, to which certain persons may have rights, as they have duties to perform toward it and the right to dispose of a corpse by decent sepulture includes the right to the possession of the body in the same condition in which death leaves it. Cyclopedia of Law and Procedure, 268. It is further laid down, p. 276, in this valuable work that: "It may be stated as the universal rule of law in civilized countries that it is an indictable offense to disinter and remove dead bodies wantonly or for the sake of gain, and by the old common law, even the fact that the motive of the person removing the body is laudable is no defense. In most of the States of the Union the violation of sepulture is made a specific offense by statute. But these statutes are not directed against and do not apply to exhumations made by public officials, with a view of ascertaining whether a crime has been committed; nor do they apply to a person who having obtained the necessary permit from the constituted authorities removes the dead body of a relative or friend for reinterment." The case of Fitzgerald v. People, 105 N. Y., 146; 11 N. E., 378, is the most nearly in point, which in our own examination we have been able to find. The facts in that case showed that one General Irvine died in the city of San Francisco suddenly after partaking of a light repast prepared by his wife; that soon after partaking of the

refreshment he became distressed and made complaint of internal pains; that the daughter of deceased was also present and left for a physician but on returning found that death had taken place. The remains were taken that night to the room of an undertaker and they were subsequently embalmed and afterwards conveyed by the wife and daughter to a cemetery where they were interred.  About a year after the death inquiry was instituted as to the cause thereof, and the defendant Fitzgerald, through certain persons consulted a physician, an intimate friend of deceased, who viewed the body, and who among other things made affidavit that he was first poisoned in his food or drink and then when in agony from the effects had been struck on the head to stop his contortions and groans.  Mrs. Fitzgerald, it seems, after having been satisfied that General Irvine had been poisoned went to the coroner of Chemung County and held a conversation in regard to the death of deceased.  Some suggestion was made in respect to summoning a jury but as a number of persons were present who had witnessed the examination, no jury was in fact sworn to hold the inquiry.  Certain portions of the body were removed and except these, the remains were recoffined and returned to the grave.  Mrs. Fitzgerald was prosecuted under section 311 of the Penal Code of that State which provides: "A person who removes the dead body of a human being, or any part thereof, from a grave, vault or other place where the same has been buried, or from a place where the same has been deposited while awaiting burial, without authority of law, with intent to steal the same, or for the purpose of dissection, or for the purpose of procuring a reward for the return of the same, or from malice or wantonness, is punishable by imprisonment for not more than five years, or by a fine not exceeding one thousand dollars, or both."  In discussing this case the Court of Appeals of New York say: "The intent of the statute is manifest.  It certainly was not intended to apply to exhumations made by legally constituted public authorities for the purpose of ascertaining whether crime had been committed in producing the death of the person whose body is exhumed.  When the exhumation is made, not secretly but publicly, on open application to the officer of justice with the duty of inquiring into the cause of death of any person whose body is brought within his jurisdiction, it is a total misapplication of the Statute against body-stealing to use it for the purpose of imposing its punishment on all persons concerned in the exhumation, in case any proceedings of the officer, under whose direction it was made, should be found to be irregular."  It has been held again that the right of interment and the right to disinter are subordinate to public health and that the disinterment may be compelled by public authorities whenever conditions become such as that the public health is threatened.  It is said in the American and English Encyclopedia of Law, vol. 5, p. 791: "Every owner of a cemetery lot must be deemed to hold it for the sole purpose of using it as

a place of burial, and he is charged with cognizance of the fact that it may become offensive, and that such use must yield to laws for the suppression of nuisances." Went v. Methodist Protestant Church, 80 Hun. (N. Y.), 585.

Title 13 of our Code of Criminal Procedure, article 1023, et seq., distinctly recognizes the proposition that in a proper case, even in advance of a legal charge of crime, a body may be disinterred and an autopsy held. By the article cited and others following, it is provided that a justice of the peace shall be authorized, and it is made his duty to hold inquests whenever any person dies in prison or is killed or dies an unnatural death from any cause, except under the sentence of the law, or indeed, when the circumstances of the death are such as to lead to suspicion that he came to his death by unlawful means. It is also provided in this same chapter that when a body upon which an inquest should have been held has been interred, the justice of the peace may cause it to be disinterred for the purpose of holding such inquest and that if necessary an autopsy may be had and for such inquiry in a case of suspected poisoning an expert chemist qualified to make an analysis of the stomach and its contents, may be employed and such examination made and that the justice in such case shall act upon verbal or written information given him by any credible person, or upon facts within his knowledge. These provisions of our Code of Criminal Procedure all seem to relate to preliminary investigations in aid of prosecutions and with a view of ferreting out offenses and crimes and none of these provisions seem to apply where, as a defensive matter, such examination and autopsy is sought, nor do they seem to apply, as we believe, in cases where, in aid of either the State or the defendant, such evidence is sought in any case actually pending on a legal charge. It is evident from the authorities, both in this State and elsewhere, that neither the right of sepulture, nor the right to have the body remain untouched and unmolested is an absolute and fixed right, but these rights must and should yield when they conflict with the public good or where the demands of justice require such subordination. It is not to be denied that none of the authorities which we have cited or others to which our attention has been called are directly in point. By analogy they furnish some aid, but it is to be confessed, this is slight. Our own reflection convinces us, however, that in legal reason and based on public policy and enlightened justice there can be no reasonable doubt as to what the court should do in a case such as is here presented. Courts were instituted among men for the purpose of promoting justice, the ascertainment of the truth in all controversies pending in such tribunals and for the protection of life, liberty and property. To fairly and rightly accomplish these laudable purposes the supreme desire and purpose is, and in every case should be, by every consideration and fair rule, to ascertain the very truth of the matter in controversy and by such rules of evidence as will,

in their nature, accomplish this result. It will be conceded, of course, that if a body could not be exhumed when an indictment was pending and the grave be made to yield up its secret, and an examination made at the instance of the defendant, such exhumation and examination ought to be made, in a similar case, at the instance of the State. To do so would not only be manifestly unfair but would be such a partial discrimination against the defendant as would shock the moral sense of all fair-minded men. And yet to refuse to the State authority, on a proper showing and in a proper case, so to do, would, in many cases permit the most abandoned criminal to go unwhipped of justice, unless such action was or might be taken by a justice of the peace, and the law in its weakness and impotence, to be made a by-word and pure mockery. Let us assume that a defendant is charged with murder by poison. The alleged poisoned man dies suddenly under circumstances of strong suspicion against the accused. His body is taken possession of by the defendant's kindred. No action is taken by the justice of the peace. The alleged murderer is related to them by close ties of blood, and either in the mistaken belief of his innocence or moved by the consideration of the proprieties and due respect for the dead or with the evil intent to shield a man known to be guilty, and examination and autopsy is refused. Let it be supposed that after indictment is found and months after the death of the party alleged to be murdered, as indeed might happen, that the State could make the strongest possible showing of the imperative necessity for an autopsy and that such examination would disclose the presence of such a poison as might still be readily and definitely detected, would or should any court, in a proper case, hesitate as to its duty in respect to such a request? And yet if the principle involved in this motion is to be denied, on principle, it should be also denied in the case assumed. The result would be, in many cases, that many murderers would go unpunished and the law be limp and helpless in a contingency thus presented, when if the court would exercise the authority inherent in its existence as a court, the truth of the matter, before in doubt, could be made the subject of an absolute demonstration. To say that the district court has no power to order and if need be with its full power compel, such an exhumation as is here sought, is to say that no court can do so. It presents the singular anomaly that in a merely suspected case of unnatural death, where no charge of murder is pending and in a proceeding where no punishment can be meted out, that an examination may be had, but that where the charge is made and it is an issue of life or death, none can be had. It is, as contended by the State, allowed where the proceeding is preliminary and unimportant and denied where it is vital. It is under the State's contention conceded to the most obscure judicial officer known to our system in advance of a trial and denied on the trial, to our chief and most important court

sitting as such. The power inheres in such court or there is, in such a case as is here presented, no such authority anywhere. It would, of course, be conceded that such a request ought not to be granted either on application of the State or the defendant, lightly or inconsiderately; nor in any case unless such course was absolutely essential to the administration of justice. Every consideration of respect for the dead and a proper sense of regard for the court's authority and dignity would suggest that the pathetic dust of the deceased should remain undisturbed until called before the great Judge at the Final Assize unless justice required a disinterment. In this case, however, the examination, it seems to us, was necessary to the protection of the appellant. It would, beyond the shadow of a doubt, have disclosed by such physical evidences as would have been incontestable whether at least one of the shots had entered the breast of the deceased. The fact, if demonstrated, must have been a powerful circumstance in appellant's favor. The good faith of his application is evidenced not alone by his sworn statement and his offer to deposit a sum sufficient to cover the cost of the autopsy but the more certainly and conclusively in that he must have known—certain it is that his able and learned counsel did know—that if his claim and testimony as to the facts asserted by him in respect to such killing were not supported by the result of such examination, that this evidence, undoubtedly admissible against him, as admissible for him, could and would have been used against him with crushing effect.

There may be no authority directly supporting our conclusion and indeed we have found none, but the conclusion at which we have arrived seems to be within itself so just, so necessary to the administration of justice, so valuable to society and the State, and so in keeping with the principles of justice that it must be correct. Such an examination would have ascertained the truth and this is the supreme end for which rules of evidence were designed and towards which they should ever tend, so that we may in all reverence say that we are "persuaded, that neither death nor life," shall separate us from the ascertainment, when in the power of the court to do so, of the very truth in every case. *Magna est veritas et prevalebit.*

We have carefully examined the other questions in the case which are both numerous and interesting. We think the rulings of the court on questions of evidence present no error for which the case should or ought to be reversed, while the charge of the court is substantially unassailable and in the singularly clear and lucid style of the eminent judge presiding at the trial.

For the single error discussed the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

BROOKS, Judge (dissenting).—I dissent from the opinion rendered in this case. Waiving the question as to whether a court under any circumstances could order the body of the deceased exhumed for the purpose of demonstrating whether he was shot in the back or in front, will say that this is not a case that requires any such action since the evidence shows clearly that the defendant provoked the difficulty. See Bowers v. State, 45 Texas Crim. Rep., 185. The defendant's uncontradicted testimony shows that he approached the deceased, and, in substance, asked him why he insulted his wife. After deceased practically admitted having done so, appellant proceeded to curse and abuse him. Among other things appellant called the deceased a damn bastardly son-of-a-bitch, deceased starting away. Appellant followed and continued to abuse him. Finally deceased turned, and in an angry tone and manner said, "Damn you, shut up," or words to that effect, and made a demonstration as if to cut appellant with a knife. Now, this statement makes the appellant guilty of at least manslaughter on the theory of the imperfect right of self-defense; that is to say, if he provoked the difficulty with the intent to kill, it matters not what the provocation may have been—even insult to his wife—it would be murder. If he provoked the difficulty without said intention, it would be manslaughter. So it follows that it is utterly immaterial whether he shot the deceased in the back or shot him in front. Being an immaterial issue in this case, under the testimony of the appellant himself, it certainly was not error in the court refusing to exhume the body for that purpose.

ON REHEARING.

December 14, 1908.

RAMSEY, Judge.—The judgment of conviction in this case was reversed on a former day of this term on the sole proposition that the trial court erred in refusing to grant an application and motion of appellant to disinter the body of deceased and arrange for examination by competent physicians to ascertain the number of bullets lodged in his body, which could have been done, and the effect of which, if favorable to appellant and in accordance with the facts, as he averred they were, would have corroborated his testimony to the effect that deceased was shot in front. The correctness of this decision is vigorously assailed on motion for rehearing. In view of the novelty of the question as well as its importance, counsel for the State were requested by the court to submit the question on oral argument, which they have done with great ability and with great candor. In deference to their insistence and the earnest dissent of our brother Brooks, we have again reviewed the question from every point of view, and have arrived at the settled conviction, which

has been rather strengthened by our subsequent investigation, that the original opinion was right—the law, and that it ought to stand.

It was conceded in argument by counsel for the State that the statement of the facts in the case as contained in the opinion was in every respect fair, true and correct, and as favorable to the State as counsel themselves would have stated them, except the facts relating to the phase of the case from which the issue of provoking a difficulty was sought to be established, and which had the effect, as the State claims, to debar appellant from the right to have submitted at all the issue of self-defense. Counsel for the State are correct in their contention that the facts were not fully stated, as to this phase of the case and it may be further admitted that the additional statement, which will. hereinafter appear, adds some support to their contention. It was not our purpose when the original opinion was offered to state all the facts in respect to this matter, for the reason, as we viewed the case, there was no serious suggestion in our minds that appellant was denied his right of self-defense by reason of anything said or done by him at the time of the difficulty, and the statement of the facts contained in the original opinion on this issue was intended to be no more than a brief summary of these events for the purpose of illustrating how the difficulty came up. In deference to the contention of counsel for the State, and with a view of making the opinion complete, we now state certain additional facts or phases of the case developed on cross-examination. On cross-examination appellant testified, substantially, as follows: "The first thing I said to him after we reached the fence, was, 'Will, wasn't you always treated right at my house?' He said, 'Yes.' I then said, 'Was you ever mistreated' and he said he wasn't. I think I then said, 'God damn your heart, what did you treat Nora like you did for?' I do not know whether I called him a son-of-a-bitch at that time or not; I don't think I did. I might. I do not remember whether or not I testified at the last trial of this case that I called him a son-of-a-bitch then. I might have. He said he didn't blame me for being mad but he was not going to take any abuse off of me; he said he would be mad, too; he would be just like I was. I said, 'You God damn son-of-a-bitch I have got abuse to give you whether you take it or not.' I don't know as he said anything then. He stood there a little while and walked to the back part of the store; he had to go by me; he did not say anything more there; he might have said something but I do not remember it. I do not know that I followed him. I was going towards the store. He was a little in the lead; he started first. I walked behind him going in the direction of the store. I guess I was abusing him going along there. "Q. Didn't you testify at the first trial of this cause as follows in regard to that: 'I don't know what was said until we quit talking just before we got to the back door there; he sorter turned around and I was still abusing him.'

Then he said, 'God damn you, shut up'? A. Yes, sir; I suppose I was still abusing him.' I then said to him, 'You God damned son-of-a-bitch, you will have to make me;' he sorter turned round to me before I made that statement; he said, 'God damn you, shut up.' He made that statement and started at me with his knife. When he said to me God damned you, shut up, I might have said to him, 'You God damned bastardly son-of-a-bitch.' I don't remember. I know I called him a son-of-a-bitch. Yes, at the last trial of this case I testified that I called him a God damned bastardly son-of-a-bitch; yes, I called him that. He had already turned nearly around to me before I made that statement. He was walking like he was walking to the door and he said, 'Now God damn you, shut up,' and turned to the side and finished turning after that. He was right close to the door when he turned, four or eight feet from that south door. He advanced on me when he turned; he started at me. I do not know how many steps. I wasn't looking at him when he started at me. I had to get my gun. When I raised my gun he was advancing on me." While there is more of the testimony, this perhaps states the case as strongly for the State as the reproduction of all of it would do. He also in this connection testified that he had killed deceased in self-defense, to save his own life and because he was mad.

It was in substance stated in the opinion that if it should be conceded that self-defense was not in the case; that is to say, that by his conduct appellant had, under the facts placed himself in a situation where, as a matter of law, he would be held to be guilty of provoking the difficulty, then it must be conceded that his application for the body to be exhumed and examined ought to be denied, since, if there was no self-defense in the case, the result of such examination, even though in every respect it supported the testimony of appellant, could serve no useful purpose. On reflection, however, it is clear that there is another ground on which the testimony sought would have been of great value to appellant. It is, we think, a settled rule that appellant is entitled to all testimony which may and will have the effect to lighten his punishment and tend to mitigate the severity of the sentence which the jury may impose upon him. Tested by this rule, it is obvious that there was one view of the case which would in any event make the testimony admissible. The verdict of the jury of necessity affirmed their belief that deceased had been guilty of insulting conduct towards appellant's wife. There was no other issue or ground upon which they were justified in finding him guilty of manslaughter. The State sought to show and its whole case was directed to prove that appellant shot deceased in the back while he was either running or retreating from him. Now, if appellant could have shown that in truth he shot his adversary while face to face and either engaged or about to engage in a mortal combat, it must be clear that he would have been put in far better

light before the jury than he would have appeared should they have believed, as the State contends, that he shot his enemy in a cowardly manner in the back. We do not, however, rest the case on this proposition. We re-affirm our opinion that the evidence in this case did not conclusively show that the acts and conduct of appellant at the time were of such nature and character as would, as a matter of law, make him guilty of provoking a difficulty so as to cut off wholly his right of self-defense. This was, as we have stated in the original opinion, the judgment and the belief of the learned trial court, and on this theory the whole case in the court below seems to have been tried. It is well settled in this State by an unbroken line of decisions that no defendant in any case can be or has ever been held to be guilty of provoking a difficulty unless his intent so to do was gathered from the testimony. It is equally well settled that this question of intent is a question for the jury. The issue and matter of provoking a difficulty implies of necessity a certain craftiness and design. It implies of necessity an intent and purpose on the part of the person killing and a disposition or purpose to do some act, the effect of which shall be to cause his adversary to attack him, so that by appearance, at least, he shall be protected by law and the death have the appearance of being in self-defense when in truth it was in pursuance of a purpose either to kill or injure his enemy. Whether such design exists in any given case is, of course, a matter for the jury, and such intent was a question for the jury in this case. It would be idle and mockery to say that in a case where the law says that by an outrage against the wife of his bosom and the mother of his child with the defendant's mind so wrought up and wrought upon as to render it incapable of cool reflection, that he should, merely because he uses some word or abuse, forfeit his right of self-defense. The law in this case is, if appellant had believed, as under the facts he was justified in believing, that the deceased, who was his friend, had, under the sanctity and protection of his home, as his guest, insulted his wife by making indecent proposals to her, that this is an adequate cause rendering his mind incapable of cool reflection. The law says again that in such state of case he has a right to go to the deceased; he has the right to demand an explanation. He has a right under the law to arm himself, if his purpose be for his own protection only in event of an attack by his adversary, and to say that in such a case that he shall be held down by the strict rules of the law, to use only the soft speech of the drawing room or the suave language of diplomacy, is to make the right which the law gives him pure mockery. The law in its wisdom wisely provides that whether in any given case he shall be held guilty of provoking a difficulty so as to cut off his right of self-defense, must, as a matter of fact, be a matter of intent to be gathered from all the circumstances. This is no new doctrine in this State. Among the earliest decisions of this court on this question is the case of Shan-

non v. State, 35 Texas Crim. Rep., 2, rendered by Judge Simkins. In that case it seems the deceased had made some remark concerning the defendant, in the presence of ladies of their acquaintance, in substance, to the effect that he was a coward. He was approached by Shannon, and said, in reply to a request for an explanation, "What I said then, I say now." Appellant then replied, "If you say I am a damn coward, you are a damned liar." Deceased again repeated, "What I said then I say now," and appellant said, "You are a lying son-of-a-bitch." In this case, when the first inquiry was made by appellant as to whether deceased had mistreated his wife, there was no denial; on the contrary there was a substantial admission of the insult. The deceased's reply is "I don't blame you for being mad. I would be mad, too, but I don't intend to take any of your abuse." It is in effect saying "I did insult your wife. Do your worst." In the Shannon case, summarizing the matter, Judge Simkins says: "To concede the remark was in fact made, it simply tends to prove that appellant had a grievance which impelled him to seek an explanation, to wit: that deceased had characterized him, in the presence of ladies, as a coward. But the vital question in the case, whether the interview was sought for the purpose of provoking a difficulty, must be clearly shown by the facts attending it, and not alone by the remarks of an excited boy amidst the bloody circumstances of his first difficulty. We do not feel satisfied with the verdict, and think a new trial should have been granted." This case and the doctrine here laid down has been followed with approval in many cases, of which the following are a portion: Winters v. State, 37 Texas Crim. Rep., 582; Airhart v. State, 40 Texas Crim. Rep., 470; Young v. State, 41 Texas Crim. Rep., 442; Hall v. State, 42 Texas Crim. Rep., 444; Doss v. State, 43 Texas Crim. Rep., 551; Hall v. State, 43 Texas Crim. Rep., 479; Melton v. State, 47 Texas Crim. Rep., 451; Beard v. State, 47 Texas Crim. Rep., 50; Craiger v. State, 48 Texas Crim. Rep., 500; Craiger v. State, on rehearing, 48 Texas Crim. Rep., 503; Keith v. State, 50 Texas Crim. Rep., 63; Mitchell v. State, 50 Texas Crim. Rep., 180; Sanders v. State, 50 Texas Crim. Rep., 430; Stewart v. State, 52 Texas Crim. Rep., 273.

To hold, as a matter of law, in this sort of a case that by precipitancy of speech, even by characterizations as insulting as those set out in the statement of facts, that appellant shall be held to forfeit his right of self-defense, is not absolutely to be assumed in the trial of such a case. To say that appellant has indeed the right to demand an explanation, the right to seek out the despoiler of his home or the author of the insult to his wife, and yet to say to him that every inconsiderate speech shall deprive him of the right of self-defense, is to make the right which the law grants him worse than useless. It is on a par with the judgment of Portia, which did indeed decree to Shylock his pound of flesh to be taken from Antonio's bosom, but with it ran the judgment, if in so doing he shed one drop

of Christian blood, that all his fortune be confiscated under the State of Venice. Such a position as we conceive can not be sustained in law or in reason and is opposed to every generous impulse of humanity.

So we come back to the question, and, as we conceive, the only question which is considered to be both serious and important, as to whether the court had the authority under the law to grant the request made by appellant. On this question appellant makes a strong showing, and it must be conceded is not by analogy at least without much support in the authorities. The chief reliance of the State is upon the case of A. & N. W. Ry. v. Cluck, 97 Texas, 172. In that case Cluck sued the railway company for damages for the injury which was alleged to have occurred through their negligence. Application was made by the defendant company for the appointment of a commission to examine the plaintiff therein on the ground that such an examination was necessary to the ends of justice, and with other allegations which it may be stated are sufficient to have induced action by the court as prayed for, if it should be held that the court had authority so to do. In the opinion in that case by Judge Brown, it in terms stated that "The right to have such examination is supported by the greater number of decisions of the courts of the States of this Union and by the text writers. The following cases support the right asserted: Richmond & D. Ry. Co. v. Childress, 82 Ga., 719; Shepard v. Missouri P. Ry. Co., 85 Mo., 629; Alabama G. S. Ry. Co. v. Hill, 90 Ala., 71; White v. Milwaukee City Ry. Co., 61 Wis., 536; Atchison, T. & S. F. Ry. Co. v. Thul, 29 Kan., 466; Schroeder v. Chicago, R. I. & P. Ry. Co., 47 Iowa, 375; Sibley v. Smith, 46 Ark., 275; Missouri & M. T. Ry. Co. v. Bailey, 37 Ohio St., 104; Lane v. Spokane, F. & N. Ry. Co., 21 Wash., 119; Wanek v. City of Winona, 46 Law Rep. Ann., 448; Graves v. City of Battle Creek, 95 Mich., 266; City of South Bend v. Turner, 156 Ind., 418; Brown v. Chicago, M. & St. P. Ry. Co., 95 N. W., 153. However, the right in this State is squarely denied and seems to be arrived at, in part, on this proposition: "Whatever may be the powers of courts of other States, there can be no doubt that the courts of Texas must look to the Constitution of this State, the enactments of the Legislature, and the common law, for their authority to proceed as requested in this case, and, if the authority did not exist at common law, and has not been conferred by the Constitution, nor by the statutes of this State, then no court in Texas has the power to force any citizen to submit to a physical examination under such circumstances." Much importance also seems to be attached in this opinion to section 9, article 1 of our Bill of Rights, which is as follows: "The people shall be secure in their persons, houses, papers and possessions from all *unreasonable seizures* or searches and no warrant to search any place or to seize any person or thing shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation." Again, in this case, some importance, as a matter of procedure, and in a measure

in justification of the rule, is attached to the right given by law
to the defendant in a civil case to take depositions of the plaintiff
so that the facts in respect to his injuries may be developed, and it
is said that this operates under our system as in the nature of a
bill of discovery. Again, it is said and held in that case that the
railway company had the right to ask him and require him to answer
in the presence and hearing of the jury as to whether or not he was
willing to consent to an examination by skilled physicians with a
view of ascertaining the nature and extent of the ailments. And it
is said "that the reason for refusing a physical examination of the
plaintiff is not that the defendant is not entitled to have the benefit
of the evidence, but because the court has no power to force the
plaintiff to submit to such examination. He has the right to submit
or refuse, but in case he should refuse, the defendant is entitled to
have that fact go to the jury to be considered by them in determining
upon the credibility and sufficiency of the testimony upon which he
seeks to recover." Again, finally it is said, "In case of unreasonable
refusal to allow examination, the court could and should set aside
the verdict unless the evidence satisfactorily established the right."
It is to be conceded that by analogy the opinion in this case is adverse
to our views, but it is not believed that it meets the issue here; on
the contrary it is easily distinguishable from this case. We have
the most profound respect for that great tribunal, but candor compels
the statement that the reasoning of the court as applied to the case at
bar is not convincing nor the conclusion sound as affecting the deci-
sion here. Evidently the constitutional guaranty to which much
importance seems to be attached could have but little application to this
case, and many of the reasons which are noted as justifying the decision
could not in any sense apply. In that case as in other civil cases, the
statute, of course, gave the defendant the right to take the depositions
of the plaintiff, and develop as far as may be the facts. In this case
the adversary of appellant is dead and no writ of man can call him
from the unseen world, and cause a disclosure of the facts of his
injuries. In the Cluck case it was stated that the defendant there
had the right to demand of the plaintiff in the presence of the jury
an answer to the question as to whether he was willing to submit
to the examination requested, and that the railway company was en-
titled to the benefit before the jury of his refusal to submit to
the examination and of such inference unfavorable to him as they
might draw from his refusal to so submit. In this case the deceased
is not a party to the record nor are his heirs at law, and the ap-
pellant here could not in the nature of things have the benefit of
a refusal of the appointment of the commission sought. Again,
it is stated in the opinion in the Cluck case, "In case of unreasonable
refusal to allow examination, the court could and should set aside
the verdict, unless the evidence satisfactorily established the right."
It is not seen how the refusal could be made effective in this case

or be made the basis of the ground of the motion for a new trial. Besides it must needs follow that if for the failure of the court to appoint a commission a new trial should be granted one time, it should always be granted under the same circumstances, and would or might have the result as in this case: a prosecution for murder is begun against a young man in the morning of his life; if the prosecution was sufficiently vigorous under our rule of reproducing the testimony of deceased persons, the prosecution might proceed; by successive grants of new trials, until he came to a "settled age with its sables and its weeds," and go on until death claimed him, with the matter still unsettled, when if the power had been exercised, which we believe inheres in every case, and the judge should avail himself of the power, which we hold he possesses, he might obtain in the very shadow of the courthouse, by the examination sought a most irrefragable proof of defendant's innocence or guilt. We believe that whenever it shall be necessary to the ends of justice that an examination of the inanimate body of the deceased in the jurisdiction of the court, should be made, that the court has the power and should exercise the right to require the exhumation made. It is contended, however, in argument that to allow this examination would lead to consequences of the most serious character, and would or might be frequently abused. We were not unmindful in preparing the original opinion of this fact, and it is there stated, as we now re-state, that it ought not to be allowed in any case unless it was imperatively demanded under the circumstances and was necessary for the due administration of justice. We prefer to believe that in such a tribunal as the district court it should never be held that "weary winged truth bearing the facts should find no spot on which to rest her feet," but on the contrary the portals of the temples of justice should stand ever open "on golden hinges turning" to welcome and receive her. If it can be said that there is no precedent for action, it can never be said again, because the rule and precedent is herein established.

Let the motion be overruled.

*Overruled.*