### JIM BALLARD v. THE STATE.

#### No. 1139. Decided May 24, 1911.

**1.—Murder—Charge of Court—Manslaughter.**

Where the defendant was convicted of manslaughter, the charge of the court on the different degrees of murder need not be considered.

**2.—Same—Charge of Court—Self-Defense—Manslaughter.**

Where, upon trial of murder, the charge of the court on the law of manslaughter was so confusing that it authorized the conviction of defendant of manslaughter on a case of self-defense, the same was reversible error.

**3.—Same—Charge of Court—Self-Defense—Standpoint of Defendant.**

Where, upon trial for murder, the court's charge on self-defense was so drawn as to leave the matter of danger from an attack of the deceased to the viewpoint of the jury, and not to the standpoint of the defendant, and further instructed the jury that self-defense is a defensive and not an offensive act and must not exceed the bounds of mere defense and prevention, the same was reversible error.

**4.—Same—Defendant's Right to Seek Explanation—Self-Defense.**

If defendant sought an explanation from deceased, and the latter's conduct was such as to lead the former to believe that his life was thereby endangered, he had the right of self-defense.

Appeal from the District Court of Shelby. Tried below before the Hon. James I. Perkins.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*D. M. Short & Sons,* for appellant.—On the court's charge on self-defense: Gary v. State, 55 Texas Crim. Rep., 90; Reinhardt v. State, 133 S. W. Rep., 265; Arnwine v. State, 50 Texas Crim. Rep., 254; Gaines v. State, 58 Texas Crim. Rep., 631; Casey v. State, 54 Texas Crim. Rep., 584; Garza v. State, 48 Texas Crim. Rep., 382; Young v. State, 53 Texas Crim. Rep., 416; Akin v. State, 56 Texas Crim. Rep., 324; Airhart v. State, 40 Texas Crim. Rep., 470; McCandless v. State, 42 Texas Crim. Rep., 58; Winters v. State, 37 Texas Crim. Rep., 582; Shannon v. State, 35 Texas Crim. Rep., 2.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, Judge.—Appellant was indicted, charged with murder, and upon a trial he was convicted of manslaughter and sentenced to two years in the penitentiary, from which judgment he has appealed to this court.

The undisputed evidence shows that appellant had spent the day away from home, and going by a neighbor's after his wife, he met her, and she told him she had started home, the road leading through the woods, and had seen a negro on a mule, and by his acts and conduct the negro had frightened her, and she had run back. She was excited, and from his wife's statement appellant became excited, and said he would go and see what the negro meant, and if he could give an explanation of his conduct. He requested his neighbor, John Thrasher, to go with him. The negro was staying at a railroad camp, and on his way to the camp he stopped at Ches Humphrey's and got a shotgun to take along with him. There were but two eyewitnesses to the killing, John Thrasher, a witness for the State, and appellant. They both testify that in the morning they were at the camp and had seen deceased in possession of, oiling and cleaning a pistol. Thrasher says that appellant got the gun and he remarked to him, " 'Don't get too hasty; I would not get into no trouble,' to which appellant replied, 'I do not think I will have any trouble; he will have some kind of excuse, and if it looks reasonable it will be all right, and if not it will be different.' That they went to the railroad camp, and appellant says, 'Howdy, boys,' and asked for a cigarette, and deceased walked over behind a negro near a tree, when appellant asked, 'Is that you, Mon?' (meaning deceased), and upon receiving an affirmative reply, asked if he got back with his milk all right, to which the negro replied he did. Appellant then said, 'Come out here, I want to see you.' The State's witness, appellant and the negro walked perhaps one hundred and fifty yards, when appellant remarked: 'Well, Mon, you scared my wife mighty bad this evening; I want to know what you meant by passing my wife like you did, speaking to her, and then coming in the road and stopping, and when she came out you was coming towards her, and then crossing the road like you was going to head her off. I want to know your business if you didn't mean any harm;' and Mon says, 'I didn't do that;' and Jim says, 'I know you did; you passed her this evening where that old vacant house is, the way we come, and the way we met you; you know where it is;' and he says, "Yes, sir;" and he says, 'You passed her and she went in and got a drink of water and plucked some flowers, and stayed long enough to give you time to get to the railroad, and she came out and found you stopped there, and you went towards her—went quartering, like you were going to head her;' and Mon says, 'I didn't do that; I never saw a woman from the time I left until I got back except in houses; I never stopped;' and Jim says, 'Don't you insinuate my wife told a lie;' and he says, 'No, sir;

if she told you that' —and he sorter hesitated and says: 'I am bound to say she made it——' and the gun fired. When the gun fired the negro fell and Jim just observed to me, 'Let's go,' and we just turned and walked off, and when we got down to the railroad where there was a wire across the railroad to keep them from running up and down the railroad, we had to hold the wire up to get through, and as we were getting through the wire Jim observed to me—that was the first word he had spoken, 'God damn him, he just as good as said my wife told a lie, didn't he?' and we walked on a piece further and I asked him, 'Jim, why did you take him off down the railroad, that if you was going to ask him about it and going to kill him——' And I asked him why he taken him off down the road if he was going to ask him, or was going to kill him—why didn't he ask him up at the camp, where all those negroes could have heard it and all be witnesses; and he says, 'That is what I intended to do after I got up there,' but he says, 'You remember one day last week some of these negroes at this same camp gathered up in front of Ches Humphrey's gate and shot eight or ten shots at one another, and Ches halloaed at them, and it didn't have any effect, and he had to go with his gun, and I thought if he made fight and tried to kill me, and I had him to kill, some of those other negroes would kill us both and our family would never know who done it.' "

The witness further testified, on cross-examination, that at the time appellant shot deceased, from the acts and conduct of deceased at the time, "it impressed him that perhaps the negro was trying to get ready to shoot appellant."

Appellant testifies, in substance, the same as the State's witness, except that he says just before he fired the shot when he remarked, "Don't be insinuating as though my wife told a lie," the negro replied, "Well, I don't say she told a lie, but I say if she said that she made and told it," and "when he said that he made a demonstration with his right hand and a forward movement. He had his right hand across his breast in his jumper. I had seen him with a pistol that morning, and I shot him because I thought he was going to shoot me."

But one shot was fired, and deceased was shot in the right hand and in the breast. There is no question but what defendant was informed by his wife of the conduct of deceased, and that she was frightened and ran. All the testimony shows this.

Of the errors complained of in the record on murder in the first and second degree we will not discuss, inasmuch as the appellant was convicted only of manslaughter. McGrath v. State, 35 Texas Crim. Rep., 414; Griffin v. State, 53 S. W. Rep., 848; Hopkins v. State, 53 S. W. Rep., 619; Williams v. State, 25 Texas Crim. App., 76.

The defendant complains of the charge of the court on self-defense, and says that the concluding part of the charge on self-defense has no basis in the evidence. That while it states the law abstractly, yet in its application in this case it was misleading, and improperly limited the

right of defendant to'act on the appearance of danger as it reasonably appeared to him. The court said: "But self-defense is a defensive and not an offensive act, and must not exceed the bounds of mere defense and prevention. To justify a killing of another there must be at least apparent necessity to ward off by force some unlawful and violent attack. It is not enough that the defendant believed himself in danger, unless the facts and circumstances, as viewed from his standpoint, were such as that the jury can say he had reasonable grounds for such belief."

Appellant also complains of the charge on manslaughter wherein the court tells the jury: "If the defendant's wife, shortly before the killing, complained to defendant of certain alleged acts of deceased by which she had become frightened, and construed as evidencing an intention on the part of the deceased to assault or wrong her, and defendant, believing said statements so made to him by his wife, sought deceased for the purpose of asking and obtaining an explanation by deceased of his conduct, and deceased, upon being questioned by the defendant concerning his alleged acts complained of by defendant's wife, made some insulting remarks to defendant, in effect imputing to defendant's wife a false statement, and accompanied same by some threatening acts towards defendant, then such acts and circumstances would be such adequate cause as is above referred to if you believe that the same, under the circumstances of the case, were such as would produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render his mind incapable of cool reflection, would be adequate cause, and this, too, although the jury might find that such threatening acts of deceased (if he was guilty of such acts) was not sufficient to justify the killing under the law of self-defense, as hereinafter explained to them," claiming that this charge was calculated to mislead the jury and to confuse them with reference to the law of self-defense, and creating the impression in the minds of the jury that it was the court's judgment that the facts testified to by defendant were not such acts as to give him the right to act in self-defense, but would only reduce the offense to manslaughter. In the case of Casey v. State, 54 Texas Crim. Rep., 586, a charge of similar character on manslaughter is condemned because it authorized defendant to be convicted of manslaughter on a case of self-defense. If the defendant is to be believed, or if deceased made a threatening gesture with his hand, placing it in his shirt, in the light that he was seen with a pistol that day, and stepped towards appellant, it would present a case of self-defense upon apparent danger, and not manslaughter. It was in the night when his wife gave him the information she did; he had a right to seek deceased and demand an explanation, and in doing so he was guilty of no wrong, legal or otherwise. And when he gave him a chance to explain his conduct, and instead of doing so he informed appellant that "it was not so, and his wife had made it," imputing to her a want of truth, if deceased did nothing, this would re-

duce the killing to manslaughter under the facts of this case. And if in addition to this, when he used this language, deceased also "lunged forward," threw his right hand in his shirt and made a demonstration that led appellant to believe his life was in danger, he would have the right to defend himself from such apparent danger. And it is not as the jury might view same four or five months later, but as it appeared to him at the time. It is enough, as we think the law is settled in this State, if the jury should find that "defendant believed he was in danger, viewed from his standpoint at the time." The question to be passed on by the jury is not whether they, in the light of later events, think appellant was in danger, but did the appellant at the time believe himself in danger. Neither do we think there are any facts or circumstances in evidence calling for a charge that "self-defense is a defensive and not an offensive act, and must not exceed the bounds of mere defense and prevention." If there were any grounds for defendant to act at all, viewed as it reasonably appeared to him, he did not go beyond what he had a right to do under the evidence, and there is nothing to suggest that he did so. Under a proper charge the jury might find that deceased made no demonstration, or did no act justifying defendant in believing that he was then and there about to be assaulted, and if they so believed defendant would be guilty of manslaughter. But if they find that deceased, by his acts and conduct at the time, created in the mind of appellant a belief that he was about to assault him, and appellant acted on that belief, and shot, there is nothing in the evidence to suggest that "such threatening acts of deceased were not sufficient to justify the killing." Neither is there any basis in the evidence calling for the charge "that the act must not exceed the bounds of mere defense and prevention." In the case of Nix v. State, 45 Texas Crim. Rep., 504, a charge in almost the same terms as this charge was condemned, and in the cases of Young v. State, 53 Texas Crim. Rep.; 416; Franklin v. State, 34 Texas Crim Rep., 286; Winters v. State, 37 Texas Crim. Rep., 582, and Gray v. State, 55 Texas Crim. Rep., 90, and 61 Texas Crim. Rep., 454, 135 S. W. Rep., 1190, it is held that appellant was in no wrong in going to deceased for the purpose of giving him an opportunity to explain his conduct, and if, before any hostile act on the part of appellant, deceased by his conduct and acts led appellant to believe that his life was in danger, it can not be said that he is thereby deprived of his right to defend himself.

The other matters complained of present no error, as shown by the record, as there are no bills of exception we can consider.

For the errors above pointed out the judgment is reversed and the cause is remanded.

*Reversed and remanded.*